Good morning. Good morning. Mal, I'd like to reserve two minutes. All right. Please watch your time. Sure. The District Court relied almost exclusively on the Walker case, as did the defendant in its brief. And the Walker case is the right case to look at. When I argued the case below, the District Court said, Are you really relying on the dissent? And we are. If you look at what the majority said in that case, which was, They said twice that the plaintiff had conceded that the device was manufactured in accordance with the standards and regulations of the FDA. They said that twice. Now, the dissent disregarded, rightly or wrongly, that concession, and then went through the regal two-part test. Are there regulations or standards that govern the device? There were in that case, and there are in this case. In that case, it was plus or minus 15% discharge of this particular drug. In this case, the silicone bleed of the implants were to be somewhere between .0007% and 1%. Counsel, do you think it's a wise strategy to rest your argument on a dissent? It's our position that but for the concession, the majority opinion in Walker would have been, I mean, the dissent in Walker would have been the majority opinion. But it wasn't. It wasn't because the defendant had conceded, essentially, the regal exception, which is the defendant had conceded that the device was manufactured in accordance with the standards and regulations. Counsel, your position is, in this case, if you have evidence that the leak was more than 1%, you get to the trier effect. That's correct, because that is the performance standard. But what does that have to do with manufacturing? Well, it has to do with the specifications, the specifications that essentially were part of the premarket approval by the FDA. If the device that's submitted and that ends up injuring a person does not meet the specifications on which the device was approved, then it's an exception to regal. I'm sorry. No, go ahead. But your expert, Dr. Fang, yes? Yes. Dr. Fang, she basically said, yes, that there had to have been a defect, but she wasn't able to testify in any regard as to the nature of the manufacturing process because she had no familiarity with it. Is that right? That's right. And I have no familiarity with it. No one, I think, can explain what manufacturing process failed here. I don't understand why that would necessarily be, why there couldn't be an expert out there who would say, you know, I'm familiar with the manufacturing process just like you could have it in a car case. I'm familiar with the manufacturing process for these kind of silicone implants, and I can testify that because this had the bleed or the leak of more than 1%, 2.5%, whatever it was, here's what would have had to have gone wrong with regard to the manufacturing. Why wouldn't that evidence have been potentially available? Well, I don't believe there's an expert who would say, oh, I know how this particular implant, of all the implants that were produced by Allergan, was manufactured, and here's why it leaks more than the specifications. I think if you look at the Walker case, you see exactly why this is an exception to Regal. In Walker, you had a device that was supposed to essentially give a very powerful and toxic drug to a patient. It had a plus or minus 15% delivery acceptance rate. In that case, much more than that was essentially given to the patient and the patient died of an overdose. That limitation, that specification is a performance standard. Now, not every performance specification impacts safety, but that one did and the one in this case does. So, counsel, in the complaint, your client alleged that the implants contained a manufacturing defect, which Allergan did not intend and the FDA did not allow. Don't you have to prove that in order to prevail in your case, if that's the allegation that you made? The question is, what's a manufacturing defect? If the product is released and it departs from the specifications of that product, of what it's supposed to do and how it's supposed to do it, and what it's, look, Regal doesn't, neither Regal nor the FDA requires a device to be perfect, nor does it require a device, if it operates in accordance with the specifications, that it won't injure somebody. What Regal requires and what the FDA requires is that the device meet the specifications and regulations on which that device was approved, particularly specifications and regulations that have to do with safety. Why? Is it your argument that Regal stands for the proposition, if the specifications are not met, that constitutes per se a manufacturing defect? Yes. Okay. So what's the language in Regal that actually says that? Regal says, essentially, that TORC claims based on a manufacturer's departure from standards set forth in the device's premarket approval applications are not preempt. And Regal also says that preemption is a disfavored conclusion for any court. So are you saying that, in this case, there was a departure from the premarket approval? Specifications and standards, absolutely. The premarket specifications and standards were, and look, what Arlogan did in this case, their own testing said that the bleed should only be .00007%. But is that what was? They overestimated that. They overestimated that in the specifications that they submitted to the FDA. They said no more than 1% and that the bleed would not be clinically significant. So they gave themselves almost a 40,000, 30,000% leeway. As in the Walker case, Walker gave it, Walker and the FDA, the device manufacturer and the FDA said, you've got up to 15% leeway. It doesn't have to be perfect, but no more than 15%. And the reason for that, the reason why that's an FDA specification, it's not an aspiration, it's a requirement, because anything more in the Walker case, anything more than 15%, could harm a patient. And if the device, if the device, if the manufacturer didn't know how much drug would be released, that it could be 15% or it could be 30% or 100% more, then that would be potentially dangerous and the FDA presumably would not approve the device. In this case, if Allergan said, we don't know how much it's going to bleed, it could bleed 1%, 5%, 100%. We don't know. Presumably the FDA would have said, well, you can't release this device, particularly if you don't know how much it's going to bleed, because it could bleed to an extent that is clinically significant, as it was in this case. Please judge. Now, a lot of courts have said that this is not a res ipsa loquitur test under the Supreme Court's case law and under Medtronic and Siegel. How is your test that you're proposing to us something other than res ipsa? Well, I think res ipsa would say if there's essentially damage, then there's liability. We're not saying that. We're saying that the specifications are that no more than 1% should bleed. And if more than 1% should bleed, then it doesn't meet its specifications and, therefore, it's not preempted by regal. I mean, it seems like a lot of the case law from other circuits have said, look, if the FDA says do these ten things and the manufacturer does those ten things and there's a failure of some kind, there's an injury, then there's no liability. Are you saying those cases are – is my reading of those cases incorrect or are those cases incorrect? I think neither. I think those cases say that just because you have an injury does not mean there's liability. So how is your theory different than that? Because it's not simply that we're saying – it's not simply that we're saying that Ms. Weber suffered damage because of whatever amount of silicone leaked, bled out of this device. We are saying that we had an expert say 2.8% of the silicone leaked out. Only one – the specifications were that no more than 1% would leak. In fact, .0007 to 1%. So I understand the ratio you've described, but it seems to me that if I read these cases in the other courts, what they're saying is that sometimes, unfortunately, there are going to be failures, but the manufacturer is not liable. If they do the 10 things the FDA says to do and sometimes there's a failure rate, the FDA is willing to accept that risk. Am I reading those cases incorrectly? You're not reading them incorrectly. If this were a case in which the breast implant ruptured as opposed to bled, if this were a case in which it ruptured, but it could still be manufactured in accordance with the specifications and standards, and in fact, Allergan said sometimes these things rupture. They can be hit, they can be bumped. Sometimes they rupture and all the silicone comes out. That's not what happened here. Here the silicone was intact. The silicone implant was intact. Allergan said it will bleed, but it won't bleed more than 1%, and the amount it will bleed will not be clinically significant. This device did not meet those specifications. So if you look at the regal analysis, you say, are there regulations and specifications, performance standards for the device? The answer is yes. No more than 1% bleed. Is the claim in this case different or additional to the federal regulations and standards? No. It's precisely that. We're saying if you look at the standards of the FDA and the specifications on which this device was approved, it failed to meet those specifications. And so there should be liability. Did you want to save any time for rebuttal, counsel? Yes. Good morning, Your Honors. Thank you for the opportunity to present our position here today. I'm Gina Marie Slattery, and I am here representing Allergan. The district court in this case properly granted summary judgment on the plaintiff's manufacturing defect claim, and the basis of her decision was exactly what you have all been discussing this morning. The plaintiff has offered no evidence, zero proof, that Allergan violated any federal requirement. And so for that same reason, we ask that this court affirm that decision. Counsel, in this case, the evidence was that the bleed was 2.8%, would your argument be the same if it was 10% or 15%? Yes. So in your view, it doesn't matter what the evidence is as to the defectiveness of the product, that the plaintiff still has to come in and demonstrate that something went wrong in the manufacturing and that it's not enough that the product was disastrously failed? Exactly, Your Honor. And I think the real problem here is that if you argue that there's a defect, in this case a manufacturing defect, that's a product's liability claim, and that is not enough to survive preemption for a Class 3 medical device. And that the way, in your view, the way Congress set this up and weighed the policy was that basically no matter how disastrously the product fails, absent evidence that there was a problem, a specific problem tied to this product in the manufacturing, even if thousands of products were manufactured, that Congress decided no cause of action. Yes, and I think that's exactly what the Supreme Court held in Regal. You have to show a departure from either the device-specific requirements here for manufacturing or the current good manufacturing practices. What language are you relying upon in the Regal case? Is that the Regal case? Is that what you're relying upon when you say the Supreme Court? Yes. What specific language are you relying upon to support your position that there has to be a manufacturing defect shown? What language? What specific language? Well, Your Honor, in that case the Supreme Court obviously was looking to determine whether or not that particular balloon catheter survived the preemption claim. And the Supreme Court made it very clear that the design defect, failure to warn, and manufacturing claims are all subject to preemption if they're Class III medical devices. But what's the language, the precise language, what page in the opinion are you relying upon in the specific discussion you're relying upon to support your argument? Well, I can't cite you to the specific page, but I can tell you. Let me ask you about this language then on page 323 where it says, the FDA requires a device that has received premarket approval to be made with almost no deviations from the specification in its approval application. What do we do with that language? That's my point exactly, Your Honor. They have no evidence that in any way we deviated from any of the specifications on the manufacturing. That's exactly my point. It didn't say in the manufacturing. This language didn't say. This language that I'm reading from Riegel didn't say in the manufacturing. It just said with almost no deviations from the specifications in its approval application. And so the point that opposing counsel is making is that in the premarket approval application, there were specifications that now have not been met. So why doesn't that fall into this language from Riegel that I just read you? Well, a couple of reasons. One, if you look at actually the label and the specifications and you look at pages 27 and 20 of their opening brief, you'll see that what they claim that the FDA has mandated in this case, that no more than 1% will ever bleed through an intact shell, is not what the FDA says at all. In fact, if you read both the directions for use or the patient label under the potential consequences of a gel bleed, it doesn't say anywhere in there that a properly manufactured implant will never bleed more than 1%. What was in the application for the breast implant, the premarket approval application? What was in there? The language that they used was to do with that a small quantity of the gel can diffuse through an intact shell. The section that the plaintiff is relying on is the serum gel studies that were done. As part of the process, and there were multiple tests that were done because they couldn't find the correct way to test for it, but when they ultimately found they put it in in vitro testing at a toxicology independent lab and they put it through serum, bovine serum, and they determined that over a course of 90 days, less than 1% diffused through the intact shell. That was not to say that a properly manufactured device would never bleed more than 1%. That's a separate section of the potential consequences of a gel bleed. So for them to come here and tell you that this is mandated, if you look at the way they actually captured it, the way they used the quotes on page 27 is not consistent with any part of the record in this case, from any source on any document. And back to the Riegel case, Your Honor, what Riegel says is that a plaintiff who wants to impose civil liability on a Class III device manufacturer must show a parallel claim. And they define the parallel claim as a violation of a federal requirement. The plaintiff isn't making a failure to warn claim here about, we said it was, we warned about this and we didn't do that. They're arguing that the manufacturing was a problem. And every case in every circuit requires them to prove some departure from a federal requirement. And other than listing for the court what the current good manufacturing practices requires, and other than accusing us conclusively of departing from the premarket approval application process, they've not given you a single fact of any departure. And every circuit that has looked at this issue all conclude the same thing, including the Ninth Circuit in the Stengel case when you sat and banked. You have to show a violation of a federal requirement. The defect in and of itself is not the equivalent of a violation. And if you look at page 27 of their brief and the problem with their whole interpretation of the case law, they say the fact that the product suffered from a manufacturing defect standing alone establishes the violation of the federal regulations and establishes a parallel claim. That is not the law. The law is a departure from the federal specifications for the manufacturing since this is a manufacturing claim. And the Walker case we cited to the court is helpful on the fact that we did not rely on the dissent. We relied, obviously, on the circuit opinion, and that was because it's a similar argument where there was an idea that plus or minus 15% of the flow accuracy of this paint pump would be what the error could possibly be in administering the medication. In that case, it was 268% above what it was supposed to be. And when they looked at that case, one of the things that they concluded was, we can't impose a standard that doesn't exist. We know that these things are going to malfunction. We understand that. And so if we apply this heightened standard, then we are impermissibly doing so under the Regal case. Basically, what the plaintiffs are asking this court to do is to assume that there's some sort of defect without ever showing any evidence of any kind of departure. And that is the sole basis why Judge Bolton decided that they could not pass the summary judgment stage. The evidence by Dr. Feng that you referred to, Judge Bennett, Dr. Feng couldn't even say to a reasonable degree of probability that the defect caused the problem, never mind that it was a departure from any kind of a manufacturing protocol. But she did testify in her opinion it was a defect. She did, Your Honor. But she also said it could have been that implant that caused her problems. It could have been the other implant that caused her problems. It could have been the right contracture that the patient developed. But that's not the ground on which you prevail. No, Your Honor. And I said in the lower court, and I'll say here, this is not the time to be disputing whether or not there was a manufacturing defect. Our point in the motion below and here today is that their burden of proof on a Class 3 medical device case is to show that we violated some federal requirement. There is no dispute that's what the law holds. And they have failed to do that in this case. Counsel, what was the Ninth Circuit on Box issue reference? The Stengel v. Medtronic case, Your Honor. And in that case, the court was actually looking at a failure to warn claim. And when the case came up, one of the reasons it was sent back down to the district court was because the district court had not allowed the plaintiff to proceed on a proposed amended complaint. And bank court had determined that the original complaint that was filed by the plaintiff had not properly pled a claim that would survive preemption, but that in the proposed complaint that hadn't been permitted, they had alleged a violation of a federal requirement. I thought you said that that case said that there must be a manufacturing defect shown. No. What was your point in citing that case? The point is that the Ninth Circuit agrees that in order to prevail in a Class 3 medical device case where the plaintiff is seeking to impose liability on the defendant, they must show a departure or a violation of a federal requirement. That's the law. The plaintiff acknowledges that, except they claim that just by showing the defect, they have somehow managed to prove also that there's a violation of the, in this case, a manufacturing claim. Where is the language in Stengel that you're relying on, that there has to be a departure from a federal requirement? Where is that language? I don't have the exact site in my notes here. All right. Since you relied on that, I thought you might have it readily available. Thank you. I don't, Your Honor. I apologize. Your Honor, the plaintiffs have also argued causation. I don't know if the court will even get to that issue. It wasn't decided by the lower court, but for the same reasons Dr. Feng didn't establish that the defect actually caused the injury of the plaintiff. And most importantly, they haven't proven that any alleged violation of a federal requirement caused this. And ultimately, Your Honor, when you listen to the plaintiff's argument, they've just admitted to you that they have no evidence. When he said, I don't think that anybody could prove up this claim, that there's specific departure from the federal requirements, either through the current. He said a manufacturing defect. He didn't say federal requirements because he's equating the approval process with the federal requirement. He's saying that in the process of getting approval, these specifications were incorporated, and because these specifications have not been met, that's the deviation from the federal requirements. Well, he has not told here or below what the deviation is in the process. And he made a manufacturing defect claim, which means he has to point to something that we didn't follow. And as Judge Owens indicated, if there are 10 steps that we're supposed to follow, and we didn't follow one of them, then he has a viable claim, if he has evidence of that. But he doesn't have evidence of that. We've given him the manufacturing documents. We gave him the specific device history record for this device, which identifies what controls were in place, what inspections were in place, and how we put the implant together. So he has that information, and he still has not shown any evidence of anything. So, Your Honor, it's our position that given the lack of evidence in this case of any departure from federal requirements, that the ruling of the lower court should be affirmed. If it's not, then every Class III medical device plaintiff will simply argue that they have a defect, and therefore it's a violation of federal requirements, and they're able to survive preemption. And that's clearly not the law. Thank you. I'm happy to answer any other questions. The bottle. Yeah, Burke, just briefly. So counsel is wrong to say that it was not in the premarket applications that this would not leak more than 1%. The documents submitted to the FDA and approved by the FDA stated that only a small quantity less than 1% would bleed. Think of what counsel is arguing. Suppose you had a diabetic and you had a situation where insulin, they had some internal insulin either in the stomach or in the arm, and the FDA specification says that this device will not cause more than 1 to 15 milligrams of insulin per hour to be released into the body. And a diabetic puts it on, and 50 milligrams per hour are released. And the patient dies because of insulin overdose. There's no claim under Regal? It's not that there's no claim. It's that the manufacturer's position is that to make that claim, you have to tie the failure to a manufacturing defect, which is something that in many types of cases plaintiffs are able to show. But sometimes they can't. And Regal doesn't require it. I mean, the plaintiff does not have to suddenly have a film of the manufacturing process and say, oh, oh, you see this step? You must have missed this step. There's, I mean, maybe you can find an expert to say that. The truth is that's not the requirement. But opposing counsel says that they produced all of the documents regarding the manufacturing process and how this particular device was manufactured. So why wouldn't that give an expert the opportunity to go through and determine whether or not there's a defect in the manufacturing process? I'm sure the manufacturing process, the way it was supposed to work, the way it is listed in its internal documents, I'm sure that that itself doesn't, you know, there's nothing wrong with the way it's supposed to be. But I think if in the end a device is distributed that does not meet the specifications that the manufacturer said it must meet in order to have FDA approval, then that clearly is outside of Regal. Again, all Regal requires is are there regulations and specifications? If there are, does this case allege damage as a result of some additional regulations or specifications, or is it parallel to what the FDA has approved? And that's exactly what we're saying. We're saying the FDA said no more than 1%. It was more than 1%. She was harmed as a result, and therefore it's not preempted by Regal. Thank you, Judge. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court.
judges: Rawlinson, Owens, Bennett